**SHOSHONE–PAIUTE TRIBE, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Richard L. OWEN, et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

**GREATER OWYHEE LEGAL DEFENSE, Plaintiff,**

v.

**DEPARTMENT OF DEFENSE, et al., Defendants.**

Nos. 92–185–S–HLR, 92–188–S–HLR and 92–0189–S–HLR.

United States District Court, D. Idaho.

Oct. 7, 1994

1298

Brian N. Donesley, Boise, ID, for Shoshone–Paiute Tribe.

William G. Dryden, Elam & Burke, Boise, ID, for Richard L. Owen and Marie Owen.

Murray D. Feldman, Brian R. Hanson, Boise, ID, for Greater Owyhee Legal Defense.

D. Marc Haws, Asst. U.S. Atty., Betty H. Richardson, U.S. Atty., Boise, ID, Peter E. Bogy, Air Force Environmental Law & Litigation Dept., AFLSA/JACE, Arlington, VA, for defendants.

### REPORT AND RECOMMENDATION AND ORDER

WILLIAMS, United States Magistrate Judge.

#### INTRODUCTION

Each of the three captioned cases challenge the legal sufficiency of the *Air Force in Idaho, Final Environmental Impact Statement,* (January 1992). (Hereafter AF EIS). The AF EIS covered three proposals. The

first proposal governed the establishment of a composite aircraft wing at the Mountain Home Air Force Base (MHAFB). The second proposal related to the modification of existing airspace to accommodate Air Force and Idaho Air National Guard flying activities. The third proposal was to analyze the environmental suitability of a proposal made by the Governor of the state of Idaho, Cecil Andrus, to create a new state managed air-to-ground training range to be used by the Air Force and the Idaho Air National Guard. As stated in the AF EIS, if the State's proposed range was found to be operationally suitable and the area's environmental resources appeared generally capable of accommodating a range, then the Air Force would conduct a subsequent environmental analysis.

The Court has before it a Motion for Partial Summary Judgment filed by Plaintiffs in *Greater Owyhee Legal Defense (GOLD) v. Department of Defense*, Civil No. 92–0189–S–HLR (Docket No. 83); a Motion for Partial Summary Judgment in *Shoshone—Paiute Tribe v. United States of America*, Civil No. 92–0185–S–HLR (Docket No. 60); and a Motion for Partial Summary Judgment in *Owen v. United States of America*, Civil No. 92–0188–S–HLR (Docket No. 65). In addition, the Court has before it a Motion to Strike and Objections to Declaration of Peter E. Bogy filed in *GOLD v. Department of Defense, supra* (Docket No. 104).

The parties' corresponding motions for partial summary judgment address the manner in which the third proposal was treated in the AF EIS. Plaintiffs contend that the Air Force violated established law by failing to conduct a full environmental impact analysis on the proposed Idaho Training Range (ITR) at the time it studied and reported on the first two proposals. Plaintiffs argue that the two actions, the beddown of the composite aircraft wing and the expansion of air-to-ground training facilities for MHAFB were connected or cumulative actions that by law had to be addressed in a single EIS.

Defendants have generally responded that correct procedures were followed when the initial EIS, examining the composite wing beddown, determined that the ITR would be operationally viable, and then a subsequent EIS examined the ITR in depth. A draft EIS on the ITR was completed in November of 1993 but no final EIS has been released. While the United States has not filed a formal motion for partial summary judgment, a request for summary judgment in favor of the United States on the same claims has been made pursuant to Rule 56(b), Federal Rules of Civil Procedure.

While the Plaintiffs have challenged the legal sufficiency of the AF EIS as it relates to the first two proposals, i.e. the beddown of the composite wing and the modification of existing air space, the focal point of this litigation has been the legal question of whether or not the ITR proposal should have been reviewed for potential environmental consequences in accordance with the National Environmental Policy Act, 42 U.S.C. § 4321, § 4331 et seq., or whether the Air Force correctly separated the beddown of the composite wing and establishment of the ITR into two separate EISs.

## JURISDICTION

U.S. District Judge Harold L. Ryan has referred all pretrial matters to this Court in a Second Order of Reference filed May 18, 1994 (Docket No. 78). Because the Motions for Partial Summary Judgment are dispositive matters, this Court shall issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). With regard to the Motion to Strike and Objections to Declaration of Peter E. Bogy, the motion is non-dispositive and can be resolved by order pursuant to 28 U.S.C. § 636(b)(1)(A).

## FACTS

Before discussing the legal principals raised by the cross-motions for partial summary judgment, it is necessary to briefly review the history of the Air Force in Idaho as it relates to air-to-ground training ranges in Southwest Idaho. Construction of Army Air Base, Mountain Home, as it was then know, started in 1942 to provide a training base for B–17 and B–24 bombers during World War II. A large land area was needed for an air-to-ground training range and Congress approved approximately 410,000 acres south of the Snake River for use by the

Air Force. At some point in time the bombing range acquired the name Saylor Creek. At the end of the war the base was deactivated and the Saylor Creek Range was shut down.

Shortly after the conclusion of WW II the Idaho Air National Guard was organized and assigned F–51 Mustangs. Needing a training range, Idaho Air Guard reopened Saylor Creek Range.

In 1949 MHAFB was reactivated as a Strategic Air Command base with B–29 bombers. In the 1960's the focus at Mountain Home was on the development of missile silos for the Titan ICBMs. Only one unit of B–47s was operating at the facility which greatly reduced the needed for a large training area. Consequently, Congress returned 300,000 acres to public use under the administration of the Bureau of Land Management (BLM) and Saylor Creek Range was reduced to its present size of approximately 110,000 acres.

In 1966 the Tactical Air Command assumed control of the base and range. In the 1970s the air space in the vicinity of MHAFB was reconfigured. F–111A aircraft were assigned to the base and started conducting low-level missions at Saylor Creek Range. During this same time period aircraft from the Idaho Air National Guard used the range in connection with their training. From the early 1970s to the late 1980s military aircraft averaged between 8,000 to 10,000 sorties annually.

In the late 1980s Congress started to address the downsizing of the military through force reductions and the closing and realignment of military installations. In 1988 Congress passed the Defense Authorization Amendments and Base Closure and Realignment Act, P.L. 100–526, Sec. 1, 102 Stat. 2623 which ultimately resulted in a decision to realign a tactical training wing of ninety-four F–4E and F–4G aircraft from California to Mountain Home. The Air Force started to take steps to implement the transfer of this number of aircraft to Idaho and recognized the need for an environmental impact statement.

On August 14, 1989 an amendment to the Notice of Intent to prepare an environmental impact statement stated that additional land would be needed for an air-to-ground gunnery range. The anticipated total acquisition would represent approximately 1,500,000 acres. 54 Fed.Reg. 18, 941 (1989). It was also proposed that the operational ceiling for aircraft be lowered to 10,000 feet.

In January 1990 a draft *Environmental Impact Statement on the Realignment of Mountain Home Air Force Base and Proposed Expanded Range Capability* was released. This report was critical of the existing Saylor Creek Range. The draft EIS stated that Saylor Creek was poorly suited for training and that an adequate land area would involve 60–by–50 nautical miles as opposed to the existing Saylor Creek Range of 12–by–15 nautical miles.[1]

The draft EIS on expansion of the training range and the use of live ordinance over a greater area was opposed by a variety of groups and individuals, including Governor Cecil Andrus. But even as this preliminary draft was being released, another round of base closures and realignments was under way and on November 5, 1990 the President approved the Defense Base Closures and Realignments Act of 1990. Ultimately a decision was reached not to go forward with the transfer of the ninety-four aircraft or to issue a final EIS based on the January 1990 draft.

While Congress was considering the 1990 Base Closure and Realignment Act, in July of 1990 the MHAFB experienced a significant draw down when two squadrons of F–111s were transferred, leaving approximately twenty-three EF–111s at Mountain Home. Total county employment decreased 13 per cent as a result of the draw down and concerns were expressed that the MHAFB may be targeted for future closure.

On July 20, 1990 Governor Cecil Andrus wrote the Secretary of the Air Force stating that his office desired to work with the Air Force to enhance the mission and strengthen the future of the base. Governor Andrus acknowledge that the earlier proposal to expand the base and training range sparked

---

1. One nautical mile equals 1.15 statute miles.

controversy and suggested a balanced solution that would address the interests of ranchers and environmental groups and the operational requirements of MHAFB, including the training range needs. Administrative Record [hereinafter "AR"] at p. 83. Governor Andrus requested that a single point of contact be established by the Air Force and Gary D. Vest, Deputy Assistant Secretary of the Air Force for Environmental Safety and Occupational Health was designated.

On February 8, 1991 the Governor issued a press release announcing the efforts of his office to submit a training range proposal to the Air Force. The size of the proposed range was 150,000 acres and the use of live munitions would be prohibited. The proposal included reducing the operational ceiling to 10,000 feet. AR at p. 182.

On April 12, 1991, seventy-one days after Governor Andrus' proposal, the Secretary of Defense submitted a recommendation to the Commission that a Composite Wing be established at MHAFB. On July 1, 1991, the Commission adopted that recommendation in its report to the President. The President adopted that recommendation, and Congress did not reject it. Accordingly, the Air Force was now required by law to establish the Composite Wing at MHAFB. *See* 10 U.S.C. § 2687.

A "Composite Wing" consists of a mixture of aircraft types: fighters, bombers, electronic combat and reconnaissance aircraft, aircraft support, and air refuelling tankers. *See* Stipulation of Facts (Docket No. 94) ¶ 2 at p. 4. In actual combat, these various types of aircraft must work together; the Composite Wing allows crews to practice the coordination that would be required in real warfare. *Id.* at ¶ 4, p. 4.

The training of the Composite Wing will typically involve over fifty aircraft, some striking targets simultaneously while others strike in a staggered sequence. *See* AF EIS at p. 2–11. The enemy targets, and associated defense weaponry, must be realistically deployed to create an authentic battlefield. One of the problems with the existing Saylor Creek Training Range is that target locations cannot be varied much, and attack angles are restricted. As a result, "air crews attack the same targets, in the same location, from the same direction, in the same ways, day after day—a situation unlike a real combat environment." *Id.* at p. 2–14.

To provide more realistic combat, the Composite Wing "require[s] a large amount of air space for establishing orbits in at least two geographically separated target areas with multiple targets that can be attacked simultaneously from different directions." *Id.* at p. 2–11. The Composite Wing also requires "electronic threat emitters" that simulate enemy radar and air defense systems. AR at p. 1678:15. These threat emitters are mobile units, weighing up to 18.5 tons. *Id.* To confuse the threat emitters, the aircraft in the Composite Wing will drop chaff and flares.

Chaff consists of fine fibers of aluminum-coated fiberglass about the thickness of a human hair. *Id.* at p. 2–15. When released from the aircraft, each chaff bundle of perhaps a million fibers spreads out in the air, reflecting radar signals and creating an electronic smoke screen to protect the aircraft. *Id.* While approximately 14,000 bundles are now being dropped annually, the Composite Wing will require 75,000 to 100,000 bundles.

Flares are used to mislead the guidance systems of heat-sensitive or heat-seeking targeting systems. While some 1,500 flares are now dropped annually, the Composite Wing will require about 25,000. *Id.* at p. 2–16.

The Composite Wing will also increase the number of supersonic flights from present levels of about two a month to about two a day. The supersonic ceiling would need to be lowered from 30,000 to 10,000 feet. *Id.* at pp. 2–26; 3–62.

In summary, the Composite Wing would require increased air space, increased supersonic flight capabilities, more challenging targets spread over a greater geographic area, and an increased use of threat emitters and defensive countermeasures like chaff and flares. *See* Stipulated Facts (Docket No. 94) at ¶ 5, p. 4. Governor Andrus's ITR proposal appeared to meet many of these requirements and was greeted with immediate enthusiasm by the Air Force. Just a few weeks after Governor Andrus made his infor-

mal proposal, Gary Vest responded that the proposal "offers significant improvements for Air Force training flexibility over the existing Saylor Creek Range." AR at p. 132.

After Governor Andrus made his formal proposal on January 31, 1991, the Air Force stated that the proposal "is very attractive, definitely has merit and should be actively pursued." AR at p. 190. As early as March 4, 1991, the Air Force had decided to "take the lead now for range development." AR at pp. 188, 1804. From that point on, the Air Force took charge of coordinating the various agencies, state and federal, whose approval and/or input was crucial to the success of the ITR. The coordination was provided by an Executive Steering Committee, chaired by Gary Vest. AR at p. 209.

The Air Force initially intended to include the ITR proposal in the same environmental impact statement that would evaluate the Composite Wing beddown. AR at p. 209. There was not, early on, a concern that the ITR would generate opposition on environmental grounds. In a March 1991 memo, Air Force Lieutenant Colonel Moriarty states that "due to its remote location and stark environment, we are anticipating little opposition from local ranchers, Native Americans, or from the environmentalists." AR at p. 190.

That assessment, however, would soon change. Others in the Air Force were apparently more aware of the history of environmental opposition on this issue, in particular the strong objections that had been raised in 1989–1990 when the Air Force had proposed its own training range over much of the same land but on a much larger scale. Some thought that public opposition to the ITR might delay the beddown of the Composite Wing. For example, on May 8, 1991, the Air Force Director of Environmental Programs, Earnest O. Robbins, noted that "[w]e have a fundamental concern with linking the Expanded Range Proposal (ERP) with the CAW [Composite Air Wing] in the EIS. We feel this union might delay the beddown process since the ERP portion is likely to face public opposition." AR at p. 307. The same fear was also voiced by Lieutenant Colonel Michael Nelson, the Air

Force's Deputy Chief of Staff for Plans and Operations. AR at p. 498. Nelson was concerned that a combined EIS would "risk delaying the Composite Wing beddown due to unanticipated environmental complications with the range proposal." Id.

These concerns prompted the Air Force to seek the advice of their General Counsel. The General Counsel "responded that although the [EIS] should address the Governor's proposal, tying a decision on that proposal to the Composite Wing beddown was not required and could indeed jeopardize the timely completion of the [EIS] and delay the beddown of the Composite Wing." AR at p. 891.

Relying on this advice, the Air Force decided that "the [EIS] will address only the general suitability of the Governor's proposal. Should the Air Force decide to pursue the range proposal, a subsequent [EIS] will be performed to flesh out its specific environmental impacts." Id. This decision was reflected in the final AF EIS which described the scope of its evaluation of the Training Range as follows:

> The State's proposal is analyzed in this EIS to determine the environmental suitability of the area for a range and emitter sites. If the State's proposed range is found to be operationally suitable and the area's environmental resources appear generally capable of accommodating a range, then the Air Force will conduct subsequent environmental analyses. These analyses will assist in basic range design, determine actual impacts, and identify specific mitigation measures. A decision whether to establish a Training Range in the area proposed by the State will not be made until the subsequent analyses are complete. The Air Force will consider reasonable alternatives to the State's proposed range as part of these analyses.

AF EIS at E–3.

The final Record of Decision (ROD) based on the AF EIS concluded that the Composite Wing would cause only minimal environmental impacts. AR at pp. 2082–86. With regard to the ITR, the ROD concluded that:

the area appears generally suitable from environmental viewpoints. Accordingly the Air Force will pursue further study of the State's proposal. These studies will identify in greater detail the potential environmental impacts associated with the development of the State proposed area, and will lead to federal decisions on whether to support the range by exchanging federal lands and contributing to the operation of the range.

AR at p. 2084.

Within about a month after the ROD was issued, a separate EIS process was commenced for the ITR. A draft of that EIS had been prepared, but no final EIS had been released.

## LITIGATION HISTORY

A short time after the AF EIS and its associated ROD were issued, suits were brought against the Air Force by environmental groups (*Greater Owyhee Legal Defense v. United States,* Civil No. 92–0189–S–HLR), Native Americans (*Shoshone–Paiute Tribe v. United States,* Civil No. 92–0185–S–HLR), and landowners (*Owen v. United States,* Civil No. 92–0188–S–HLR). The Air Force filed motions to dismiss in all three cases alleging that the claims of the parties were not ripe for review. Specifically, the Air Force claimed that the ITR EIS might moot the controversy because it may lead to a decision by the Air Force to not proceed with the ITR.[2]

This Court disagreed and recommended a finding that the AF EIS was a final agency action that could be challenged because it did not include a full analysis of the ITR. In addition, the Court recommended that Count Two of the Owen Complaint be dismissed. That count alleged that the Air Force's action constituted a taking without just compensation. In addition, the Court recommended that one of two claims contained in Count Four of the Tribe's Complaint be dismissed. The Tribe had asserted that the Department of Interior failed to intervene and protect its interests in the AF EIS process. The Court recommended a finding that the Department of Interior had no duty to intervene on the Tribe's behalf and the claim be dismissed.

The Air Force also sought to dismiss the Tribe's claim that the Air Force should be enjoined from proceeding with any land exchange because the land had not been identified. The Court rejected the Air Force's challenge on this point and allowed the Tribe to maintain its claim for injunction. *See* Report and Recommendation (Docket No. 76).

On May 18, 1994, U.S. District Judge Harold L. Ryan adopted the recommendations of this Court. *See* Order (Docket No. 77).

## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

GOLD has now moved for partial summary judgment on Claims four, nine, twelve, thirteen, and sixteen in its First Amended Complaint. The Tribe has moved for summary judgment on Paragraphs twenty-nine and thirty contained in their First Claim for Relief of their Complaint. The Owens have moved for partial summary judgment on Counts four, eight, eleven, twelve, thirteen, and fourteen in their First Amended Complaint. All three of these Motions for Partial Summary Judgment are directed to the contention that the ITR EIS should have been combined with the AF EIS. As noted earlier, the Air Force has requested partial summary judgment that the two EISs need not have been combined.

## STANDARD FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56(c), summary judgment shall be rendered when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In ruling on summary judgment motions, the Court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Electrical Serv., Inc.*

---

2. At the time of the argument on the United States' Motion to Dismiss the draft ITR EIS had not been released. Since that time the draft has been issued and as noted by all parties, the draft ITR EIS, with some modifications, recommends that the ITR proceed.

v. Pacific Elec. Contractors Ass'n, 809 F.2d 626 (9th Cir.1987). The Ninth Circuit has stated "put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." Id. at 631. When the moving party has met its initial burden of demonstrating the absence of any genuine issue of material fact, the non-moving party must produce specific facts showing that there remains a genuine factual issue for trial. Steckl v. Motorola, Inc., 703 F.2d 392 (9th Cir.1983).

## STANDARD OF REVIEW

Because a review of an EIS necessarily examines the decision of a federal agency, the Administrative Procedure Act (APA), 5 U.S.C. § 706, comes into play. That statute empowers the courts to set aside agency actions if they fail to conform to any of six specified standards.

The first of those six standards requires setting aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. § 706(2)(A). The Air Force urges this Court to apply that standard which it describes as "highly deferential." See Brief of Air Force at p. 5. The Plaintiffs, on the other hand, promote review under the fourth APA standard, which finds unlawful any agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). A judicial gloss on this section has developed in the Ninth Circuit so that Courts examine the preparation of the EIS under a "rule of reason" that evaluates "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." Enos v. Marsh, 769 F.2d 1363, 1372 (9th Cir.1985) (quoting from Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir.1974)).

■ When examined closely, these two standards for review are surprisingly similar. Under § 706(2)(A), the Court must conduct a "searching and careful" inquiry, while § 706(2)(D) instructs the Court to take a "hard look" at the issues. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); Enos, 769 F.2d at 1372. The Court is forbidden under both standards from substituting its own judgment for that of the agency, but instead must satisfy itself that the agency made a "reasoned" decision. Marsh, 490 U.S. at 378, 109 S.Ct. at 1861; Enos, 769 F.2d at 1372. Indeed, the standards are so much alike that the Supreme Court has observed that the difference between them is slight and "not of great pragmatic consequence." Marsh, 490 U.S. at 377, n. 23, 109 S.Ct. at 1861, n. 23.

Nevertheless, there is a perception—certainly among the litigants here—that the arbitrary and capricious standard is generally more deferential to the agency. But, as will be discussed later in this Report and Recommendation, the result in this case will be the same under both standards of review. After discussing the legal standards governing this case, the Court will review the AF EIS under both standards of review.[3]

## LEGAL ANALYSIS

An EIS is required "in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The threshold issue is whether the ITR is a "proposal" for "major federal action." The defendants claim that the ITR was an Idaho state project that remained too vague and undefined to ripen into a federal proposal.

■ The term "major federal action" is defined in the regulations promulgated by the Council on Environmental Quality (CEQ) that are binding on all federal agencies. The pertinent regulation is 40 CFR § 1508.18 which provides as follows:

Major Federal action includes actions with effects that may be major and which are

---

3. Although the Court will proceed under both standards of review, there is a strong argument that the § 706(2)(D) standard is the correct choice. It is that standard, and not the arbitrary and capricious standard of § 706(2)(A), that ap- plies to cases where the central issue is whether "established and historical facts presented by the Administrative Record satisfy [certain legal standards]." Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir.1992).

potentially subject to Federal control and responsibility.

. . . .

(a) Actions include new and continuing activities, including projects and programs entirely or *partly* financed, *assisted,* conducted, regulated, or approved by federal agencies ... (emphasis added).

While the ITR was initially conceived by Governor Andrus, the Administrative Record shows that the Air Force—at the very least—"partially assisted" the development of the range. For example, Michael E. Ryan, Deputy Chief of Staff of Air Force Operations, states in a memo dated March 4, 1991, about two months before the EIS process began, that the Air Force "should take the lead now for range development." AR at p. 188. Gary Vest, the Air Force point man, chaired the Executive Steering Committee which was designed to coordinate work on the EIS. AR at p. 209. At one point Vest described the coordinated work of federal and state agencies developing the ITR as "a single joint venture." AR at p. 209.

 This evidence in the record establishes that the Air Force at least "partly assisted" in the development of the ITR, and hence the range was a "major federal action" under the CEQ regulations. The next issue is whether the ITR was so vague that it never became a "proposal."

The term "proposal" in 42 U.S.C. § 4332 was reviewed by the Supreme Court in *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). At issue there was whether the Government needed to prepare a regional EIS before granting leases to operate coal mines on federal lands in the Northern Great Plains Region. Individual EISs had been prepared on each lease, and a national EIS had been prepared to evaluate the program's nation-wide impact. The plaintiffs, however, wanted an EIS devoted to analyzing the *regional* impacts of the program on the ground that the Government was contemplating a plan for regional development of coal in the Northern Great Plains Region.

The Supreme Court concluded that no regional EIS was required. The Court rejected plaintiffs' argument that an EIS is required when an agency is "contemplating" a project:

At some points in their brief respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

*Id.* at 410, n. 20, 96 S.Ct. at 2730, n. 20 (emphasis in original).

About two years after *Kleppe* was decided, the Council on Environmental Quality published regulations concerning the EIS process. *See* 40 CFR Part 1502. These regulations contain much more detail than *Kleppe,* but basically track *Kleppe*'s holdings. *Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir. 1985).

The CEQ regulations define "proposal" as follows:

Proposal exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

40 CFR § 1508.23.

The importance of preparing an EIS early in the process is stressed throughout the regulations. For example, 40 CFR § 1502.5 states that the EIS "shall be prepared early

enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made."

The CEQ regulations go on to provide that "for projects directly undertaken by Federal agencies the environmental impact statement must be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary." 40 CFR § 1502.5(a).

In *Kleppe* there was no program undergoing a feasibility analysis; there was no plan for regional coal development whatsoever. *Kleppe*, 427 U.S. at 400–01, 96 S.Ct. at 2726. Thus, there was "nothing that could be the subject of the analysis envisioned by the statute for an impact statement." *Id.* at 401, 96 S.Ct. at 2726.

The ITR proposal, by contrast, was detailed enough to be analyzed, and had moved far beyond the "contemplation" stage when the AF EIS was being prepared. In fact, only a month after the AF EIS ROD was issued, the ITR was so detailed that work on the ITR EIS immediately began.[4] But even before this point, the ITR had sufficient detail to be studied in an EIS.

The formal proposal by Governor Andrus set the general boundaries for the Idaho training range as follows:

> The major area selected for U.S. Air Force consideration is located in Owyhee County roughly fifty nautical miles southwest of Mountain Home Air Force Base and fifty nautical miles west-south-west of Saylor Creek Range. The proposed area is shaped like an elongated heart, with the small end bracketed on the south by the Owyhee River, a major portion of the west side formed by Deep Creek and the southeast tip of the heart enclosed by the lower reaches of Battle Creek. The northeast bulge of the heart follows a pronounced ridge line that drops off into Big Springs Creek. The northwest bulge of the heart generally follows Hurry Back Creek to a point just short of the mountains to the

north where the boundary turns east to an intersection with Big Springs Creek.

> The north-south axis of the area measures thirty nautical miles.

> The northern portion of the heart averages 12.5 nautical miles by 12.5 nautical miles. A natural divide formed by Pole Creek/Camas Creek bisects this northern area of an approximate one-third/two-thirds ratio. The total area of the proposed Training Range, as depicted on the enclosed maps, contains approximately 150,000 acres and is roughly 25 percent larger than the Avon Park Range.

AR at 161–162.

Governor Andrus recognized that as of the date of the formal proposal, January 31, 1991, he had "not identified specific target sites necessary to meet Air Force requirements." AR at p. 180. But that further specificity was soon developed.

As of July 9, 1991, when the Air Force contracted with Science Applications International Corporation to provide the AF EIS, the Air Force was able to include in the contract a map of the proposed ITR showing potential target placement areas, and primary and secondary probable impact areas for the Range. *See* Affidavit of Thompson (Docket No. 61) at Tab 15, filed in *Owen v. United States*, Civil No. 92–0188–S–HLR. In September of 1991, the Air Force authorized a multi-seasonal analysis (AR at p. 1118) that would cost about $90,000.00. AR at p. 1881–A.

During the same time that the AF EIS was being prepared, the Air Force contracted with Spectrum Sciences and Software to prepare a "Desktop Design" of the ITR. AR at p. 1677. The "Desktop Design" contains detailed range layouts with target area boundaries defined by precise longitude and latitude coordinates. AR at p. 1677:10–37.

Thus, by the time the AF EIS was being prepared, the general acreage and boundaries of the ITR had been established, and the target locations had been plotted with precise longitude and latitude coordinates. The Defendants would never have committed

---

4. The AF EIS ROD was issued March 11, 1992. The Training Range EIS began with a Notice of Intent (NOI) to prepare the EIS on April 24, 1992. *See* Training Range EIS at p. 1–34.

$90,000.00 for a multi-seasonal analysis if the ITR had merely been a vague, undefined "area."

In fact, the Defendants have come late to their argument that the ITR was too vague. Back when the AF EIS process was just beginning, the Air Force felt the proposal was definite enough to include in the AF EIS. The Administrative Record, discussed previously, shows that the ITR was pulled back out of the AF EIS not because the Range was too vague, but rather because of a concern that environmental opposition to the Range might delay the Composite Wing bed-down.

When the AF EIS process began, the Air Force knew that Saylor Creek Range was clearly inadequate for its needs and that a larger training range was almost a military necessity. This is best evidenced by the Air Forces' own comments on the adequacy of the existing Saylor Creek Range for its training needs:

Since 1984, the Air Force has identified several weaknesses with the existing Saylor Creek Range. It provides an elementary array of tactical targets cramped into a relatively small area. Added to the constraints of limited axes of attack and inadequate airspace for an appropriately sized composite force ... AF EIS at p. 2–14.

\* \* \* \* \* \*

The 12,200 acre impact area is among the smallest in the Tactical Air Command Inventory ... AF EIS at p. 2–13.

\* \* \* \* \* \*

Saylor Creek Range provides a conventional setting that will adequately accommodate the Composite Wing's basic training for weapons delivery. Although it provides a conventional training environment, it falls short, in many respects, in meeting tactical training needs. ......Saylor Creek Range, with its accompanying airspace for military operations, does not allow training with a mix of operational weapons, tactics, and electronic combat systems ... AF EIS at p. 2–13.

\* \* \* \* \* . \*

Saylor Creek will not meet the requirements for realistic training for Composite Wing aircrews for four main reasons. First, only one flight (i.e. four aircraft) of aircraft can train on the range at one time ..... Second, the range can only be attacked straight from the south, on a narrow range of headings, which does not simulate combat conditions. Third, the F–15E and F–16C aircrews require training with laser-guided weapons from multiple directions. Saylor Creek Range does not have this capability. Fourth, aircrews on F–15Es and F–16Cs require extensive night training. Saylor Creek Range is limited to two aircraft at a time if nighttime safety standards are to be maintained. As a result, it would be difficult for all the air-to-ground fighters associated with the Composite Wing to attain adequate night training. Realistic composite force training also requires geographically separated tactical ranges with multiple targets. AF EIS at p. 2–27.

Equally as telling is the Air Force's efforts in 1990 to include a 1,500,000 acre training range in its draft EIS when it was contemplating the transfer of ninety-four F–4 aircraft to MHAFB. Clearly the need for a larger range was apparent at that point in time and the establishment of the composite wing at MHAFB has in no sense done away with inadequacy of the Saylor Creek range to provide realistic training. The connection between more aircraft at MHAFB and a larger range is supported throughout the record before the Court and it is with a great deal of skepticism that the Court considers the argument by the Air Force that the ITR was a vague concept and not definite enough to include in the same EIS that led to the beddown of the composite wing.

The range proposal was at the feasibility stage as defined in 40 CFR § 1502.5(a). The program was sufficiently definite to meet the criteria of *Kleppe* and 40 CFR § 1508.23. For all of these reasons, the Court would recommend a finding as a matter of law that the ITR was a proposal of major federal action under 42 U.S.C. § 4332(2)(C) at the time the AF EIS was being prepared.

■ The next issue is whether the ITR proposal should have been included within the AF EIS. While administrative agencies must be given considerable discretion in defining the scope of environmental impact statements, "there are situations in which an agency is required to consider several related actions in a single EIS." *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985). "Not to require this would permit dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.*

More specifically, the CEQ regulations require "connected actions" to be considered together in a single EIS. 40 CFR § 1508.25(a)(1). Connected actions are defined as actions that:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

Both sides agree that the three subsections of the regulation are to be read in the disjunctive, not the conjunctive. *Blue Ocean Preservation Soc. v. Watkins,* 754 F.Supp. 1450 (D.Haw.1991). In *Thomas v. Peterson, supra,* the Ninth Circuit held that a single EIS must contain the combined environmental impacts of a logging road and the timber sales that the road would facilitate. The Circuit reviewed the record and concluded that the road and timber sales were "inextricably intertwined" and thus were "connected actions" under the CEQ regulations.

Subsection (iii), when read in light of the facts of this case, asks two questions to determine if actions are connected: (1) Is the ITR an interdependent part of the Composite Wing?; and (2) Does the ITR depend on the Composite Wing for its justification? To answer these two questions, *Thomas* directs

this Court to consider the agency's own statements as well as the timing of the planning for the two actions. *Id.* at 758–60.

The Air Force asserts that the actions are not connected because the ITR was proposed long before the decision was made to bring the Composite Wing to MHAFB. But this argument ignores language contained in Governor Andrus' proposal showing that from the very day the proposal was made, it was intended to accommodate a Composite Wing even though the final beddown decision had not yet been made:

We have assumed that the training range complex must support sorties that would be generated by a composite wing and involve Idaho Guard and Air Force interface.

Thus the land acquisition process will be concerned with size and location of parcels for tactical target arrays, electronic emitter arrays, command and control facility locations and access to the selected sites.

AR at p. 142 (emphasis added).

This connection is highlighted in the Air Force's Desktop Review which states that the ITR "was developed by the State to facilitate the quality training needs of the Composite force." AR at p. 1677:1. Gary Vest stated that "the range, the composite wing, and the future of the Air Force in Idaho are related." AR at p. 2202. Vest expanded on these comments in a December 31, 1991[5] letter to Governor Andrus:

As we have discussed many times, the State's proposal would provide a much needed training capability in the region. Such capability could become very important as the Air Force continues to reduce its size and number of bases. As units are consolidated, and base structure is reduced, an increasing burden on remaining training facilities can be anticipated. *Your proposal offers the opportunity to develop a training infrastructure to accommodate the evolving and future needs of the Air Force's composite wing at Mountain*

---

5. The letter does not have a date affixed, but the date is provided in the Table of Contents in

Volume 1 of the Administrative Record.

*Home Air Force Base, components of the National Guard, and other services.*

AR at p. 1597 (emphasis added).

As previously discussed, the Air Force concluded initially that the two actions were connected enough to be included in the same EIS, but then later decided to separate them because of concerns over beddown delays.

In addition, as noted earlier in this Report and Recommendation, since at least 1984 the Air Force has been concerned with the limitations imposed by the Saylor Creek Range on its training mission at the MHAFB. Each effort to expand the number of aircraft at MHAFB, i.e. the 1989–1990 proposed transfer of ninety-four aircraft, has been linked with the requirement of a substantially expanded training range.

This evidence shows conclusively that the ITR and the approximately seventy aircraft that make up the Composite Wing are "inextricably intertwined" just as the road and timber sales were in the *Thomas* case. The evidence shows that the ITR was an interdependent part of the Composite Wing and that it depends on the Composite Wing for its justification, thereby triggering subsection (iii) of 40 C.F.R. § 1508.25(a)(1).

At oral argument, the Air Force relied heavily on *Hudson River Sloop Clearwater, Inc. v. Dept. of Navy,* 836 F.2d 760 (2nd Cir.1988). In that case, the plaintiffs argued that the Navy should have included, in a combined EIS, the environmental impacts caused by construction of a homeport for Navy ships, along with the environmental impacts caused by construction of housing for personnel working on those ships. The Navy countered that the actions were not connected under the CEQ regulations because the homeport would proceed with or without the housing. The Second Circuit agreed with the Navy, holding that because the larger action (the homeport) would go forward even without the smaller action (housing), the homeport had "independent utility" and was hence not connected under the CEQ regulations. *Id.* at 764.

This Second Circuit decision is, of course, not binding on this Court. And the reasoning of that decision is of little value since the "independent utility" test that it applied is much different than the test applied in the Ninth Circuit. The Second Circuit test is clearly a subjective test: Because the Navy officials had testified that the homeport would go forward with or without the housing, the court found that the homeport had independent utility. There was no inquiry by the court into whether the Navy's decision was reasonable or rational.

The test in the Ninth Circuit, however, is objective, not subjective. Under the "independent utility" test formulated in *Thomas v. Peterson, supra,* the Circuit framed the issue as whether "the dependency is such that it would be *irrational, or at least unwise,*" to go forward with the dependent action without the larger action. *Id.* at 759–60 (emphasis added). Later in the opinion, the Circuit again asks whether the agency "might *reasonably* consider" going ahead with only the dependent, or smaller, action. *Id.* at 760.

This highlights another difference between the tests: The Second Circuit asks whether the *larger* action will proceed without the smaller; the Ninth Circuit asks whether the *dependent,* or smaller, action will proceed without the larger. This difference is profound. The Second Circuit would ask whether the Composite Wing would beddown without the ITR. In sharp contrast, the Ninth Circuit asks whether the ITR would reasonably proceed without the Composite Wing.[6]

Because the tests are so different, the Court finds *Hudson River Sloop* distinguishable, and refuses to apply the Second Cir-

---

**6.** Early in the *Thomas* opinion, the Circuit stated that "the timber sales cannot proceed without the road, *and* the road would not be built but for the contemplated timber sales." *Id.* at 758 (emphasis added). *Hudson River Sloop* interpreted this discussion as applying to subsection (ii), not subsection (iii). 836 F.2d at 763. This Court agrees. *Thomas* discusses the independent utility test—applicable to subsection (iii)—later in the opinion and does not require that the larger action and the dependent action must meet a "mutual pre-condition" test where the larger must be a precondition for the dependent *and* vice versa. Such a test would not be consistent with the language of subsection (iii) which at most only requires a finding that the dependent action would not reasonably proceed without the larger action. *Thomas,* 753 F.2d at 760.

cuit's test for independent utility. Applying instead the Ninth Circuit's test, the Court finds that the ITR would not have been proposed without the Composite Wing. From its very inception, the ITR was designed to accommodate the Composite Wing.[7] The two questions asked by subsection (iii) of 40 CFR § 1508.25(a)(1) are both answered in the affirmative: (1) the ITR is an interdependent part of the Composite Wing; and (2) the ITR depends on the Composite Wing for its justification. The Court therefore recommends a finding that the ITR and Composite Wing are "connected actions" under the CEQ regulations.

The regulations also require that "cumulative actions" be considered together in a single EIS. *See* 40 C.F.R. § 1508.25(a)(2). Cumulative actions are defined as actions "which when viewed with other proposed actions have cumulatively significant impacts." *Id.* Cumulative impacts result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

■ The Air Force argues that the impacts of the ITR were unduly speculative. *See* Government's Brief at p. 17. The impact of future actions may be considered a "cumulative action" so long as the future action is "reasonably foreseeable." *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174 (9th Cir.1990). In that case, the plaintiffs alleged that a logging road would be used not only to permit logging during the period covered by the EIS, but would also permit future logging which was not examined in the EIS. The Circuit found no evidence to support the environmentalists' allegations that the road was designed to permit *future* logging. There were no future logging plans submitted to the court, and the evidence was clear that the Government intended to close the road when logging during the EIS period was completed. The Circuit therefore found that the future logging was not "reasonably foreseeable," and hence not a cumulative impact.

Unlike *Headwaters,* the proposal in this case very clearly involves future impacts. The Court has already concluded that the ITR proposal was not speculative, but was definite at the time of the AF EIS. Unlike *Headwaters,* there was a definite proposal in this case and reasonably foreseeable impacts. Thus, the ITR and Composite Wing were cumulative actions that must be considered together in a single EIS under 40 C.F.R. § 1508.25(a)(2).

## INJUNCTIVE RELIEF

All of the Plaintiffs seek injunctive relief which is best summarized in Gold's First Amended Complaint (Docket No. 80):

> Enjoin the use of all federal funds for proposals and actions contained in the Air Force in Idaho EIS and ROD pending completion and circulation of an EIS and ROD complying in full with the requirements of NEPA.

> Enjoin all military training activities authorized by the EIS and ROD, including, but not limited to, the delivery of ordnance, the ignition and release of flares, and the delivery of chaff materials in the military airspace over Southwestern Idaho and adjoining regions.

> Enjoin the Air Force decision to pursue further study of a proposed air-to-ground training range in Southwestern Idaho unless conducted as part of an environmental impact statement compared in compliance with NEPA that addresses the full scope of Air Force in Idaho proposals, including connected and cumulative actions.

> Enjoin the Air Force decision to submit an application to the Federal Aviation Administration for expanding the military air space designations within Idaho.

> Enjoin the Air Force decision to conduct supersonic operations above 10,000 AGL within the military air space areas within Idaho.

*Id.* at pp. 39–40.

■ In general, the grounds for injunctive relief are irreparable injury and inadequacy

---

7. The court acknowledges that the ITR would also be used by the Idaho Air National Guard but no one has seriously argued that a new 150,000 acre training range would be necessary solely for the training of the few aircraft assigned to Gowen Field.

of legal remedies. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Id.*

The Ninth Circuit modified this test somewhat when violations of NEPA were involved. *See Save Our Ecosystems v. Clark*, 747 F.2d 1240 (9th Cir.1984). In that case, the court stated that "[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action." *Id.* at 1250. That decision by the Ninth Circuit, however, appears to have been overruled by *Amoco Production Co. v. Gambell*, 480 U.S. 531, 541, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). In that case, the Supreme Court stated that the presumption of the Ninth Circuit was "contrary to traditional equitable principles." *Id.* at 545, 107 S.Ct. at 1404. The Court went on to state as follows:

> [T]he environment can be fully protected without this presumption. Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.* at 545, 107 S.Ct. at 1404, *see also Public Service Co. of Colorado v. Andrus*, 825 F.Supp. 1483, 1504–05 (D.Id.1993).

Counsel have generally done a superb job of briefing this case, but let up somewhat in discussing injunctive relief. The parties spent very little time discussing in detail the nature and scope of the injunction. In the face of this lack of guidance, the Court is very reluctant to recommend a detailed injunction that might have unintended consequences. Instead, the Court will recommend that if the U.S. District Judge agrees with the legal conclusion reached herein, i.e. that the AF EIS was not prepared in accordance with applicable law and the CEQ regulations, that the District Court direct counsel to first meet and determine if a stipulation as to the nature and scope of a proposed injunction can be agreed to pending the completion of a new EIS and ROD. If counsel are unable to agree, then additional briefs should be submitted on the issue for the Court's consideration. At the District Court's discretion, these matters could be referred to this Court.

## COMMENTS ON INJUNCTION

If briefing on the injunction issue is forthcoming, the Court offers the following comments by way of observation, not recommendation. Nothing said in this section is to be interpreted as a ruling or recommendation on the injunction issue, but is simply a starting point for discussion.

As discussed above, irreparable injury and an imbalance of hardships are necessary for an injunction under *Gambell.* The Composite Wing is currently using the existing Saylor Creek Range and its air space assets for conventional air-to-ground, air-to-air, and low-altitude operations training. *See* Stipulated Facts (Document No. 94) at ¶ 27, p. 8. The Composite Wing uses remote ranges (Boardman Naval Weapons System Training Facility, the Utah Test and Training Range, Nellis AFB Range, and Fallon Range Training Complex) on a transient basis for tactical air-to-ground electronic combat and Composite Force training. *Id.* at ¶ 27, p. 9.

If the Composite Wing is being trained elsewhere, and in the absence of evidence that the Air Force would suffer undue hardship if this situation continued until a combined EIS was completed, it would appear that the balance of hardships tips decidedly toward Plaintiffs.

■ With regard to the scope of the injunction, it is clear that any injunction issued by the Court could not affect the decision to beddown the Composite Wing at MHAFB. The United States Supreme Court has held that decisions of the President under the Defense Base Closure and Realignment Act (DBCRA) of 1990 are not reviewable by courts. *Dalton v. Specter*, —— U.S. ——, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). The DBCRA does, however, permit judicial review of implementation decisions under the National Environmental Policy Act of 1969

(NEPA), 42 U.S.C. § 4321 *et seq.*; P.L. 101–510, § 2905(c)(2)(A); 10 U.S.C. § 2687 note. And it is solely the implementation decisions that are under review here.

It is therefore clear that if an injunction issues, it will have absolutely no impact on the decision to beddown the Composite Wing at MHAFB, and will not affect the training of the Composite Wing. In fact, an injunction may well have no effect whatsoever on the Composite Wing's current training program since that training is now occurring largely out-of-state. The effect of any injunction will therefore be narrow, and will essentially be designed to maintain the status quo until the combined EIS and associated ROD can be completed. Within these parameters, counsel should be able to reach agreement on the nature and scope of an injunction if the District Court uphold this Court's recommendation on a combined EIS.

### FINAL RECOMMENDATION

Based on the discussion above, the Court recommends that the following findings and conclusions be adopted. With regard to the pending Motions for Partial Summary Judgment, the Court recommends a finding that no material issue of fact exists, and the Plaintiffs are entitled to judgment as a matter of law, with respect to the following items:

1. That the Idaho Training Range proposal constituted a proposal of major federal action significantly affecting the quality of the human environment under 42 U.S.C. § 4332(2)(C);

2. That the Idaho Training Range and Composite Wing are connected actions pursuant to 40 CFR § 1508.25(a)(1);

3. That the Idaho Training Range and Composite Wing are cumulative actions pursuant to 40 CFR § 1508.25(a)(2);

4. That the failure to include a study of the environmental impacts of the Idaho Training Range in the AF EIS was an abuse of discretion or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); and

5. That the failure to include a study of the environmental impacts of the Idaho Training Range in the AF EIS was "without

observance of procedure required by law" under 5 U.S.C. § 706(2)(D).

Based on these findings, the Court would recommend the following conclusions:

1. That the Motion for Partial Summary Judgment filed by Plaintiff GOLD in *Greater Owyhee Legal Defense v. Department of Defense,* Civil No. 92–0189–S–HLR, be GRANTED and that the Plaintiffs be granted summary judgment on Claims four, nine, twelve, thirteen, and sixteen of their First Amended Complaint;

2. That the Motion for Partial Summary Judgment filed by the Tribe in *Shoshone–Paiute Tribe v. United States of America,* Civil No. 92–0185–S–HLR, be GRANTED and that the Tribe be granted judgment on Paragraphs twenty-nine and thirty contained in their First Claim for Relief in their Complaint;

3. That the Motion for Partial Summary Judgment filed by the Owens in *Owen v. United States of America,* Civil No. 92–0188–S–HLR, be GRANTED and that the Owens be granted summary judgment on Counts four, eight, eleven, twelve, thirteen, and fourteen of their First Amended Complaint;

4. That the Motion for Partial Summary Judgment requested by the Government in all three cases be DENIED;

5. That this matter be remanded to the Defendant Agencies to conduct a combined Environmental Impact Statement that includes an analysis of both the Idaho Training Range and the Composite Wing in a single EIS.

6. That if this Court's recommendations regarding a combined EIS are adopted, that counsel be required to submit new briefing on the injunction issue; that counsel be required to meet together to attempt to reach agreement on the injunction; and that the injunction include a stay of all litigation in the case until the combined EIS and associated ROD are complete.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(d) or as a result that party may waive the right to raise factual

and/or legal objections in the Ninth Circuit Court of Appeals.

## ORDER REGARDING PLAINTIFFS' MOTION TO STRIKE DECLARATION OF BOGY

The Plaintiffs have moved to strike the declaration of Peter E. Bogy (Docket No. 104). Because the Court has not relied on the Bogy declaration or its attachments in any way in this Report and Recommendation, the Court shall deny the Plaintiffs' motion as moot. Finding good cause therefor,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Plaintiffs' Motion to Strike and Objections to Declaration of Peter E. Bogy (Docket No. 104) be, and the same is hereby, DENIED, as moot.